

ORIGINAL SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST OF TX
FILED

2017 JUL -7  P 2: 23

DEPUTY CLERK_____

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel.,<br>DR. SUSAN DE SESSA, an individual<br><br>Plaintiff,<br><br>v.<br><br>DALLAS COUNTY HOSPITAL<br>DISTRICT d/b/a PARKLAND HEALTH<br>AND HOSPITAL SYSTEM<br><br>Defendant. | § § § § § § § § § § § § § |

**FILED UNDER SEAL**

CIVIL ACTION NO. _____

**3:17CV1782-K**

## APPENDIX TO COMPLAINT

Respectfully submitted,

 _/s/ Daniel K. Hagood, P.C._
Daniel K. Hagood, P.C.
State Bar No. 08698300
FITZPATRICK HAGOOD
SMITH & UHL, LLP
2515 McKinney Avenue, Suite 1400
Dallas, Texas 75201
Telephone:  214-237-0900
Facsimile:   214-237-0901

and,

 _/s/ Thomas E. Shaw_
Thomas E. Shaw
State Bar No. 18152750
THE LAW OFFICES OF
THOMAS E. SHAW, P.C.
9304 Forest Lane
Suite 252, North Building
Dallas, Texas 75243-6238
Telephone:   214-221-7429
Facsimile:    214-221-7447

and,

___/s/ Marc Tecce___
Marc C. Tecce
State Bar No. 24068652
THE LAW OFFICES OF MARC TECCE
9304 Forest Lane, Suite 251
Dallas, Texas 75243
Telephone:    214-614-8317
Facsimile:    214-221-7447
Email:  marc@teccelaw.com

**ATTORNEYS FOR RELATOR**

**CERTIFICATE OF SERVICE**

On July 7, 2017, I hereby certify that I have served United States' Attorney General's

Office, 950 Pennsylvania Ave., NW, Washington, DC 20530-0001 via Certified Mail and the

Northern District of Texas United States Attorney's Office, 1100 Commerce Street, Third Floor

Dallas, Texas 75242-1699 via hand delivery.

___/s/ Marc Tecce___
Marc C. Tecce

## TABLE OF CONTENTS

A. De Sessa Affidavit.................................................................................1

    a.  Exhibit 1..................................................................15
    b.  Exhibit 2..................................................................21
    c.  Exhibit 3..................................................................28
    d.  Exhibit 4..................................................................66
    e.  Exhibit 5..................................................................77
    f.  Exhibit 6..................................................................140
    g.  Exhibit 7..................................................................153
    h.  Exhibit 8..................................................................161
    i.  Exhibit 9..................................................................162
    j.  Exhibit 10..................................................................165
    k.  Exhibit 11..................................................................177
    l.  Exhibit 12..................................................................187
    m.  Exhibit 13..................................................................197
    n.  Exhibit 14..................................................................201
    o.  Exhibit 15..................................................................202
    p.  Exhibit 16..................................................................204
    q.  Exhibit 17..................................................................207
    r.  Exhibit 18..................................................................212
    s.  Exhibit 19..................................................................214
    t.  Exhibit 20..................................................................220
    u.  Exhibit 21..................................................................223
    v.  Exhibit 22..................................................................224
    w.  Exhibit 23..................................................................229
    x.  Exhibit 24..................................................................230
    y.  Exhibit 25..................................................................231
    z.  Exhibit 26..................................................................261
    aa. Exhibit 27..................................................................272
    bb. Exhibit 28..................................................................276
    cc. Exhibit 29..................................................................283
    dd. Exhibit 30..................................................................285
    ee. Exhibit 31..................................................................290
    ff. Exhibit 32..................................................................298

B. OIG Report..................................................................301

## AFFIDAVIT OF SUSAN DE SESSA

**STATE OF TEXAS**          §
**COUNTY OF DALLAS**    §

BEFORE ME, the undersigned authority, personally appeared Susan De Sessa, first duly sworn upon her oath, deposed and said as follows:

1.      "My name is Susan De Sessa.  I am over eighteen (18) years of age, and I am of sound mind and fully capable of making this Affidavit.  I have never been convicted of a felony. I am familiar with and have personal knowledge of each and every statement of fact set forth in this Affidavit.  All of the facts stated herein are true and correct to the best of my knowledge.

2.      I served as a Clinical Epidemiologist in the Infection Prevention department of Parkland Hospital from July 2012 through November 2014. Attached hereto as Exhibit 1 is a true and correct copy of the job description for Clinical Epidemiologist. Attached as Exhibit 2 is my CV.  My role at Parkland involved analyzing the infection statistics at Parkland.  The job included "[c]ollaborat[ing] with clinicians and hospital staff regarding the collection and entry of data, data analysis, and the dissemination/presentation of research results," and "[d]irect[ing], perform[ing], and/or support[ing] Infection Prevention improvement and outcome analyses." [See Exhibit 1]."

3.      In short, I have personal knowledge that, in order to receive large amounts of Federal funding, Parkland represented compliance with rules and regulations directly and/or indirectly related to the Federal funding; however, Parkland's internal policies are set up to mask noncompliance and Parkland has a complete disregard of numerous compliance issues. As addressed herein, during my time at Parkland I raised numerous issues of non-compliance and blatantly false data being reported. This was met with a blind eye from all at Parkland (including the CEO) and ultimately led to my termination.  The response and indifference from Parkland


indicates a willful falsification and misrepresentation of data to continue to receive this funding and increase overall funding to which Parkland should not be entitled.

**Background of Affiant**

4.      I am a Doctor of Public Health (DrPH) which I earned from the University of North Texas Health Science Center. I have a Masters in Public Health (Epidemology) from the University of North Texas Health Science Center. I am Certified in Infection Control by the Certification Board of Infection Control and Epidemiology. I am Certified in Public Health (CPH) by the National Board of Public Health Examiners. I am a Certified Professional in Healthcare Quality (CPHQ) by the National Association for Healthcare Quality.   In addition, I have a Bachelor of Science degree in Biology from Texas A&M University – Kingsville and completed coursework towards a Masters in Psychology.   Previously, I worked as an Epidemiologist focusing on infection prevention at the Corpus Christi - Nueces County Public Health District in Corpus Christi, Texas.

**Parkland's Failure to Comply with CMS Reporting Requirements and Agreements with the Government**

5.      I know from my course of employment at Parkland and from a review of Parkland records, that in September 2011, the Centers for Medicare & Medicaid Services ("CMS"), part of the Department of Health and Human Services, performed an inspection of Parkland's compliance with the CMS Conditions of Participation.  These CMS Conditions of Participation are the health and safety standards that health care organizations must meet in order to participate in the Medicare and Medicaid programs, including the Emergency Medical Treatment and Active Labor Act.  Attached as Exhibit 3, is a true and correct copy of the CMS Conditions of Participation.  The CMS assessment found that Parkland was not fully compliant. Accordingly, in September 2011, CMS sent a termination notice and notified Parkland that it intended to terminate Parkland's participation in the Medicare and Medicaid programs due to

failure to meet certain standards. Recognizing the role Parkland serves in providing health care to the people of Dallas County, CMS suspended that termination when Parkland entered into a Systems Improvement Agreement ("SIA"). A true and correct copy of the SIA is attached as Exhibit 4. In addition, in May of 2013, Parkland entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) for a duration of five years. A true and correct copy of the CIA is attached hereto as Exhibit 5.

6.      Parkland had a huge financial interest in making the Government believe that these agreements and conditions were being complied with and did whatever it took to convince CMS that this was the case. In August of 2013, CMS notified Parkland that Parkland was in substantial compliance with the Conditions of Participation, that Parkland had successfully completed the requirements of the SIA, and that CMS was rescinding its Termination Notice. On August 22, 2013, CMS notified Parkland that it had restored Parkland's deemed status for full participation in the federal healthcare programs. However, in August of 2014, surveyors from CMS again found that Parkland was not in compliance with the CMS Conditions of Participation and found "immediate jeopardy to patient health and safety." Parkland was again notified that CMS intended to terminate Parkland's participation in the Medicare and Medicaid programs. After an additional survey in September 2014, CMS removed the immediate jeopardy to patient health and safety finding but found that Parkland remained out of compliance with the CMS Conditions of Participation. A third survey in October 2014 found Parkland was in substantial compliance with the applicable regulations and in November 2014, CMS formally restored Parkland's deemed status for full participation in these federal programs.

7.      Parkland utterly failed to abide by the Corporate Integrity Agreement with the Office of

the Inspector General of the Department of Health and Human Services which imposes

numerous requirements on the hospital. Under the CIA, Parkland was required to have a

disclosure program and disclose any major events to the Government.  However, Parkland

ignored countless disclosures made to it by me, despite the specific and detailed nature of my

findings and disclosures. See, e.g., email to Karen Liptak ("Liptak"), Vice-President of Quality

and Safety, attached as Exhibit 6, summarizes numerous issues I had discovered. Yet Parkland

did not address these issues.

8.      When the Texas Department of State Health Services (which controls federal funding)

was coming for an inspection of Parkland in August of 2014, Parkland had advanced warning. I

specifically instructed Liptak that the State had inaccurate data before it came to audit, yet

Parkland turned a blind eye and took no action to correct the data. Attached as Exhibit 7, is an

email referencing the upcoming State audit and a copy of the State audit based on false data.

9.      Parkland went beyond merely refusing to address my disclosures when it began taking

steps to prevent me from being able to identify other problems in the future. Parkland quickly

began imposing numerous limitations on me to prevent me from discovering false data, including

restricting my access to hospital records and documents, as well as prohibiting me from

inspecting any Parkland operating rooms.  When I uncovered and reported missed infections by

other infection prevention personnel, I was told essentially to stay in my lane and not look at

those missed infections. For example, attached as Exhibit 8, is an email forwarded to Alysha

Cartman, Director of Compliance Investigations, original email 2014-07-18 – Sylvia tells me

stop reviewing charts to which I am not assigned even though I was uncovering problems. ("I'm

referring to you reviewing SSI procedures that are not assigned to you. Thanks, Sylvia").

**Failure to Comply with Infection Control Requirements**

10.     According to publicly available information, true and correct copies of which are

attached hereto as Exhibit 9, Parkland received over $38 million in 1115 Waiver funding over

the past 4 years, solely based on reportedly reducing hospital acquired infections.  I know the

reported hospital acquired infection rate to be inaccurate.

11.     At the same time as the above-mentioned CMS audits, I observed and became aware of

numerous, ongoing and overarching problems with Parkland's infection prevention and control

procedures.  Parkland doctors and staff took intentional steps to conceal and minimize the

documentation of various types of infections, communicable diseases, and hospital-acquired

conditions.  I found that Parkland doctors repeatedly failed to document various types of hospital

acquired infections, surgical site infections, and surgical wounds on patients' medical records.  I

also discovered that Parkland doctors repeatedly failed to culture surgical wounds, thereby

preventing the diagnosis of any possible infection. This improper fixing of the numbers produces

false and misleading data with respect to various infection levels and other statistics that

Parkland is obligated by law to submit to CMS in order to receive Medicare and/or Medicaid

funding.  The inaccurate and incomplete medical records not only puts the patients at risk but

also is a violation of the Conditions of Participation.  Many of these deficient and/or fraudulent

reporting and documentation practices directly resulted in incorrect data being submitted to CMS

pursuant to the annual payment update reporting requirements, as well as to the Office of the

Inspector General ("OIG"), pursuant to Parkland's obligations under its Corporate Integrity

Agreement.

12.     The ongoing missed reportable diseases is well-documented. Attached as Exhibit 10, are

numerous emails sent in 2014 where I notified Jennifer Masengill, Parkland's Infection

Preventionist, of numerous non-reported reportable diseases. I also notified Sylvia Trevino, Interim Director of Infection Prevention, of numerous non-reported reportable diseases (see emails, true and correct copies of which are attached as Exhibit 11), Dr. Robert Hendler, Chief of Quality and Safety, and Alysha Cartman, Director of Compliance Investigations (see emails, true and correct copies of which attached as Exhibit 12). Sylvia Trevino specifically instructed me to stop reviewing for missed infections that "are not assigned to me." See Exhibit 8. Attached as Exhibit 13, is an email dated July 24, 2014, where I notified Dr. Robert Hendler, Parkland's Chief of Quality and Safety at the time, of the underreporting of infections and the distribution of false information.

13.     Dr. Pranavi Sreeramoju, Chief of Infection Prevention, oversaw the final reported numbers and missed multiple surgical site infections that were tracked internally and externally. For example, in fiscal year 2012, one breast infection was reported out of 169 surgeries (only 0.59%); nationally, the average infection rate for breast procedures ranges from 5-20%. Because of this oversight, Parkland had an outbreak of post-operative surgical site infections in mastectomy patients in October of 2012. As a result of this outbreak, previous data were reviewed and an overall infection rate of 5.42% for breast procedures in fiscal year 2012 was calculated. In addition, patients who had a mastectomy with immediate reconstruction were found to have an infection rate of over 40%, but the Chief of Infection Prevention failed to address this outrageously high rate of complication. Dr. Sreeramoju then created new guidelines to replace NHSN guidelines for surgical site infections (SSIs). As an example, Dr. Sreeramoju created a guideline that all surgical site infection diagnoses had to be made by an attending physician, as did all documentation of pus/purulent drainage. This rule is inconsistent with the CDC surgical site infection criteria that includes a broad definition for attending physician. See

Exhibit 14, which is a true and correct copy of the CDC Criteria.  I confirmed with the CDC that

residents' diagnoses meet the CDC criteria. See Exhibit 15, a true and correct copy of an email

with a CDC representative.  I informed Parkland of this but received no feedback or confirmation

from them. Multiple infections were not reported simply because a resident physician (as

opposed to the specific attending physician) documented pus or diagnosed post-operative

infections. Attached as Exhibit 16, are examples of Parkland records that have clear indications

of SSI, but were neither documented nor reported.  Attached as Exhibit 17, are documents that I

hand delivered to Dr. Hendler and Dr. Sreermoju in a meeting that indicated clear infections that

were ignored due to using the wrong criteria.  Dr. Sreermoju did not want to re-review this

missed infection brought to her attention because she was busy. See email from Dr. Sreermoju, a

true and correct copy of which is attached as Exhibit 18.

14.     I also observed a repeated and ongoing problem with Methicillin-resistant

Staphylococcus Aureus (MRSA) contamination, particularly in the Parkland's intensive care

units (ICUs).  Attached as Exhibit 19, is a copy of excerpts from an Infection Prevention FY13

report to the Board of Managers. The report indicates that MRSA is the leading cause of surgical

site infections and the central line associated bloodstream infections. Despite Parklands'

awareness of the unacceptably high rate of MRSA infections in the intensive care units at

Parkland, both the doctors and the infection control officer failed to perform adequate prevention

and control measures to properly and effectively address this problem. Instead, Dr. Pranavi

Sreeramoju, Chief of Infection Control, presented misleading data to the Infection Prevention

and Control Committee (IPCC) which led to discontinuing all active MRSA

surveillance.  Attached as Exhibit 20, is a copy of an email stopping MRSA screening in ICUs

claiming zero MRSA bloodstream infections in the previous fiscal year.  However, there were

infections in the ICUs in the previous fiscal year. See data from Parkland's internal records, true and correct copies of which are attached as Exhibit 21. Parkland continued active surveillance in its burn ICU for a limited time after the other ICUs, but discontinued that shortly thereafter (in the middle of an MRSA outbreak). See email between Dr. Brett Arnoldo and Dr. Sreeramoju discussing a meeting to discontinue the active surveillance, a copy of which is attached as Exhibit 22. Parkland began using Chlorhexadine Gluconate ("CHG") on burn patients specifically against manufacturer specifications and warnings.

15.     Parkland's policy became in effect: don't check for infections; find less infections; report less infections and make more money. In an Infection Prevention Department meeting that I attended, a Parkland Resident specifically stated that he was frustrated that he was instructed not to culture for infections. Dr. Sreermoju laughed and said that Parkland did not want more infections so it would keep restricting cultures. The internal Parkland data is consistent with the restricted cultures, showing a significant decrease in the amount of "cultured SSIs" reported in Fiscal Year 2014 as a result of these policies. For example, in fiscal year 2012, only 30% of documented infections were not cultured. In fiscal year 2013, this number had jumped to 47% of documented infections not being cultured and up to 55% in fiscal year 2014. This failure to properly screen patients for MRSA infections led to a persistent failure to alert other departments within the hospital that patients going into those departments may have been exposed to or colonized with MRSA.

16.     When Parkland discontinued active surveillance, it addressed the MRSA problem merely by instituting daily ("CHG") baths for all patients in the ICUs alleging it was in compliance with CDC recommendations, when, in fact, it was not. Parkland doctors and staff failed to institute the significant additional component to the procedure mandated by research guidelines – that the

patients be given mupirocin in addition to the daily CHG baths.  Finally, Parkland failed to put into place and maintain adequate remedial measures and/or ongoing surveillance to ensure that this dangerous condition was resolved.

17.    I discovered that as a matter of routine practice, Parkland doctors would avoid documenting wound infections by using misleading diagnoses that would lead to erroneous International Classification of Diseases (ICD) coding. Instead of documenting that the patient had a post-operative infection (Code 998.59), doctors would simply document inaccurately that the patient had "wound cellulitis," (Code 682.9). As a result, the data that Parkland reported to both CMS and OIG was false and incorrect, in that it significantly underreported the true number of surgical site infections.

18.    The effects of these improper reporting practices with respect to surgical site infections are evidenced by the ongoing and significant discrepancies observed by me between the data recorded in the "Theradoc" records system, the data submitted to NHSN and the data recorded in the log required to be maintained by Parkland's infection control officer. In fact, these discrepancies indicate that the incidence of surgical site infections is not the only data that is being incorrectly documented and reported.  Specifically, I observed constant and ongoing discrepancies between these two databases (and numbers submitted to NHSN) with respect to the incidences of the following conditions: Catheter Associated Urinary Tract Infections ("CAUTIs"), Central Line Associated Bloodstream Infections ("CLABSIs"), Surgical Site Infections ("SSIs"), hospital acquired flu, inpatient flu, and CJD (Mad Cow Disease).

**Failure to Maintain a Safe Environment**

19.    I observed daily and persistent violations of the Conditions of Participation such as operating rooms and/or equipment visibly contaminated with blood and other potentially

infectious bodily fluids. Continued observation and inspection revealed that the contamination of the operating rooms and equipment was perpetuated as a result of inadequate turnover cleaning, as well as inadequate terminal cleaning. In some instances, I found that the terminal cleaning logs had been falsified. In April of 2014, as a result of the MRSA outbreak in the Burn ICU, I submitted cultures to the lab of reportedly clean operating rooms and MRSA was found. Attached as Exhibit 23 is the lab report indicating MRSA in a "clean" operating room. Attached as Exhibit 24, is a copy of an email from Richard Stetzel, Director of OR, indicating that rooms had not been properly cleaned. Attached as Exhibit 25, are copies of numerous pictures of the dirty conditions at Parkland.

20.     I reported the problems in the ORs at Parkland to the Director of the ORs, the Director of Environmental Services, the Director of Infection Prevention, Chief of Quality and Safety, and the Senior Vice President of Surgical Services. To back up my reports of contaminated operating rooms, I provided photographs of the various blood spots and other contaminations in the operating rooms. This would certainly constitute a sufficiently specific disclosure so as to permit a determination of the appropriateness of the alleged improper practice and provide an opportunity to take appropriate corrective action. Thus, upon receiving my disclosure, Parkland was obligated under the Corporate Integrity Agreement it entered into with the OIG, to conduct an internal review of the allegations and ensure that proper follow-up was conducted. [See CIA, p. 19-20 (Exhibit 5)]. Of course, Parkland did not report anything.

**Parkland's Retaliation and Retribution**

21.     Parkland engaged in numerous, continuous acts of retaliation and retribution against me in response to my efforts to identify and correct the problems at Parkland identified in this affidavit and culminating in my termination. During my time at Parkland, I was consistently

given Manager Appraisals with solid or exceptional contribution ratings. True and Correct copies of these Manager Appraisals are attached as Exhibit 26. However, in August 2014, I was suspended by Parkland for a period which was to begin on August 26, 2014, and end on October 3, 2014. Attached as Exhibit 27, is a true and correct copy of the Corrective Action Report reflecting my suspension. During this period of suspension, I was prohibited by Parkland from speaking to any Parkland employees other than Arthur Ferrell, a member of the Human Resources Department. Despite being the sole Parkland employee that I was permitted to contact in any way during my suspension, Mr. Ferrell repeatedly ignored multiple attempts by me to contact him. For instance, one of my numerous attempts to contact Mr. Ferrell was an email that I sent on September 11, 2014. Even after waiting a full fourteen days, as of September 25, 2014, I did not receive any type of acknowledgment or response whatsoever from Mr. Ferrell. I attempted to contact Mr. Ferrell but received no response. In light of the obvious futility of my attempts to contact Mr. Ferrell, I decided to copy Dr. Hendler, the Chief of Quality, on my email. As a result, I finally received a response to my communications, however, in a further retaliatory act, it consisted of an additional ten-day extension of my period of suspension. I believe this additional suspension was solely the product of my decision to copy Dr. Hendler on my email.

22.     On October 13, 2014, prior to my return from this suspension, I was forced to sign a "final warning" about my alleged improper behavior. Pursuant to this warning, a number of punitive conditions were imposed upon me. One of these conditions was a requirement that I abide by a "Performance Improvement Plan" (hereinafter "PIP"). Attached as Exhibit 28 is a copy of the "final warning" and PIP. The PIP contained substantial restrictions on my ability to perform my role as a Clinical Epidemiologist. Specifically, I was explicitly instructed via the PIP that I was not permitted to seek out or look into any discrepancies among Parkland's records.

Further, if I happened to discover any such discrepancies in the course of my work, I was prohibited from reporting my findings to anyone at Parkland other than my director. I was also instructed that I was prohibited from reporting any findings to Dr. Hendler, the Chief of Quality, in particular. I believe the PIP restriction placed upon me directly violates the Corporate Integrity Agreement with the OIG, which included a Disclosure Program. The Disclosure Program calls for the right of all individuals to be included in the Disclosure Program. [See CIA, p. 19-20 (Exhibit 5)]

23.    Early on in my employment at Parkland, I sought and received an ADA accommodation. Beyond these restrictions on my ability to perform my basic job functions, the retaliation against me continued in the form of the removal of my ADA accommodation effective immediately upon return from my suspension.  In addition, my working hours were changed upon my return, despite no similar changes to the working hours of any other employee. Upon becoming aware of the removal of my ADA accommodation, I contacted the Vice President of the Human Resources Department to ask if Parkland removed my accommodation pursuant to Parkland policy. As a result of this communication, I was once again suspended, effective October 23, 2014. Upon my return from suspension on November 10, 2014, I was immediately terminated. I appealed the termination. The appeal was heard by a three member panel. Significantly, two of the three members of this panel (Sharon Phillips and Jacqueline Brock), were "Sponsors" of Parkland 1115 Waiver Projects related to 1115 Waiver funding to Parkland. Attached hereto as Exhibit 29, is a copy of a list of the "Sponsors" of Parkland 1115 Waiver Projects.

24.    Significantly, before my termination, on October 14, 2014, I sent a detailed email to the CEO of Parkland, Dr. Fred Cerise. A copy of this email is attached hereto as Exhibit 30. In the email, I explained in detail the documented violations of Parkland policy, NHSN infection

standards, CMS reporting requirement standards, etc. I offered to provide evidence to Dr. Cerise

and encouraged him to speak to me about the issues raised in the email. Dr. Cerise did not

contact me to investigate these allegations.  Rather, I was terminated shortly thereafter.

Additionally, on March 11, 2015, after being put on notice of the inaccuracies in infection rates

and Parkland's policies to falsify these numbers, Parkland circulated a press release consciously

disregarding the issues raised by me.  A copy of an article discussing this press release is

attached as Exhibit 31 and quotes two key Parkland Officials:

> Such infections "are a major concern for every hospital," said Dr. Fred Cerise,
> president and chief executive officer of Parkland Health & Hospital System. "And
> while Parkland's rates of [hospital associated infections] place us in good standing
> compared to national benchmarks, we are continually focused on this issue."
>
> A statement released by the hospital concluded that "Parkland has already begun to
> see early successes" in an initiative, called Reduce Infections Together in
> Everybody. It was launched in 2013 and is being funded by Medicaid through the
> state's 1115 Waiver program.
>
> "Our goal is to accelerate improvements and achieve much-needed standardization
> in knowledge, attitudes, practices and cultures of safety related to these potentially
> preventable complications," said Dr. Pranavi Sreeramoju, chief of infection
> prevention at Parkland.
>
> ****
> In 2014, Parkland saw improvement in all three areas, including a 30 percent
> reduction in the rate of bloodstream infections, 57 percent fewer catheter-associated
> infections and an 18 percent fall in sepsis.
>
> "We are pleased with these results, but there are many more things to do,"
> Sreeramoju concluded. "It will continue as an integral part of Parkland's
> commitment to continuous quality improvement and transformation of health care
> delivery."

26.     Parkland represents compliance to the public, but the very policies that Parkland

brags about, and receives increased Federal funding for, are not designed to help patients

and reduce infections but to only improve numbers through willful blindness and

falsification of data. Attached as Exhibit 32, are charts summarizing the large amounts of

missed infections in 2014 ignored by Parkland.

Further, Affiant sayeth not."

_Susan De Sessa_

SUBSCRIBED TO AND SWORN BEFORE ME on this 23rd day of May, 2017



LYNN GRIMES
My Notary ID # 7119842
Expires July 14, 2020

_Notary Public, in for the State of Texas_

# PARKLAND HEALTH & HOSPITAL SYSTEM

# JOB DESCRIPTION

## FOR COMPENSATION USE ONLY

| JOB TITLE: Clinical Epidemiologist – Infection Prevention | JOB CODE: 1400 | FLSA: Exempt |
|---|---|---|
| DATE WRITTEN: 07/31/2012 | DATE REVISED: N/A | |

### DISCLAIMER

The following job description is designed to indicate the general nature and level of work performed by employees within this classification. It is not designed to contain or be interpreted as a comprehensive inventory of all duties and responsibilities required of employees assigned to this job.

### PRIMARY PURPOSE

Responsible for providing technical assistance and research consulting to clinicians and hospital administration in the areas of research study design, study implementation, data analysis, and biostatistics.

Job Description Form - Page 2

| JOB TITLE: CLINICAL EPIDEMIOLOGIST – INFECTION PREVENTION | JOB CODE: 1400 | DATE REVISED: 07/31/2012 |
|---|---|---|

## MINIMUM SPECIFICATIONS

### Education:
- Must have a Master's degree in Public Health, Biostatistics, Epidemiology, Health Service Research or a related field, an emphasis in disease investigation and control is preferred.

### Experience:
- Must have three years of infectious disease epidemiology or one year of applied health care epidemiology experience.
- Prefer experience with data analysis and presentation, communication of risk and risk reduction strategies.

### Equivalent Education and/or Experience
- None

### Certification/Registration/Licensure:
- None

### Skills or Special Abilities:
- Must have an applied medical, healthcare, behavioral research and statistical background, particularly experimental designs and clinical trials, and medical statistics. Must have background in advanced multivariate statistical applications and analysis.
- Must have ability to mine data from a variety of Information Systems and reconcile disparate data in reports that are sourced in multiple systems.
- Must have the ability to work independently and execute multiple assignments with minimal supervision.
- Must have a high degree of proficiency in MS Access, MS Excel, MS PowerPoint and MS Word software applications.  Prefer high degree of proficiency in SPSS or SAS.
- Must have the ability to hear and communicate in English with others in a clear, understandable, and professional manner on the phone and in person; and the demonstrated use of good written and verbal communication skills.
- Must be able to interact effectively with a variety of hospital personnel, peers, and medical staff.

Job Description Form - Page 3

| JOB TITLE: CLINICAL EPIDEMIOLOGIST – INFECTION PREVENTION | JOB CODE: E550 | DATE REVISED: 04/18/2012 |
|---|---|---|

## JOB ACCOUNTABILITIES

1. Provides technical assistance and research consulting to clinicians and hospital administration in the areas of study design, study implementation, data management, and statistical analyses.

2. Collaborates with clinicians and hospital staff regarding the collection and entry of data, data analysis, and the dissemination/presentation of research results. Trains hospital personnel and departmental staff as needed in the application of statistical findings, research design and analyses, and problem solving.

3. Directs, performs, and/or supports Infection Prevention improvement and outcome analyses.

4. Interprets and presents findings to multiple hospital and physician groups. Support publication of research findings, medical writing, and research editing.

5. Utilizes standard and non-standard biostatistical and database methods for the production of statistical analyses.

6. Prepares written reports of statistical analyses, including relevant statistical theory, references, methods, results, and conclusions. Maintains appropriate systems for database associated management.

7. Identifies ways to improve work processes and improve customer satisfaction. Makes recommendations to supervisor, implements, and monitors results as appropriate in support of the overall goals of the department and Parkland.

8. Stays abreast of the latest developments, advancements, and trends in the field of statistical analysis methodology by attending seminars/workshops, reading technical and academic resources, and actively participating in professional organizations. Integrates knowledge gained into current work practices.

9. Maintains knowledge of applicable rules, regulations, policies, laws and guidelines that impact the assigned area. Develops effective internal controls designed to promote adherence with applicable laws, accreditation agency requirements, and federal, state and private health plans. Seeks advice and guidance as necessary to ensure proper understanding.

Job Description Form - Page 4

| JOB TITLE:  CLINICAL EPIDEMIOLOGIST – INFECTION PREVENTION | JOB CODE:  1400 | DATE REVISED:  07/31/2012 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT (ADA)
## ESSENTIAL FUNCTIONS WORKSHEET

I. **PHYSICAL REQUIREMENTS**

**A.** DO THE MAJOR ACTIVITIES OF THE JOB INCLUDE ANY OF THE FOLLOWING? (Check frequency that applies.)

| REQUIREMENT | WEIGHT (Lbs) | HOW OFTEN | | | | DOING WHAT |
|---|---|---|---|---|---|---|
| | | Daily | Wkly | Mnthly | Yrly | |
| Carrying | - | | | | | |
| Dragging | - | | | | | |
| Holding | - | | | | | |
| Pulling | - | | | | | |
| Pushing | - | | | | | |
| Lifting | - | | | | | |

**B.** DO THE MAJOR ACTIVITIES OF THE JOB INCLUDE ANY OF THE FOLLOWING? (Check frequency that applies.)

| REQUIREMENT | HOW LONG (Hrs/day) | HOW OFTEN | | | | DOING WHAT |
|---|---|---|---|---|---|---|
| | | Daily | Wkly | Mnthly | Yrly | |
| Sitting | 7.50 | X | | | | Desk work area |
| Standing | .50 | X | | | | Walking around Parkland campus, office area. |
| Kneeling | - | | | | | |
| Bending | - | | | | | |
| Twisting body | - | | | | | |
| Walking | .50 | X | | | | Walking around Parkland campus, office area. |
| Reaching (how high or low?) | - | | | | | |
| Squatting (knees bent, weight on feet) | - | | | | | |
| Running | - | | | | | |
| Crawling | - | | | | | |

**C.** DO THE MAJOR ACTIVITIES OF THE JOB INCLUDE ANY OF THE FOLLOWING? (Check frequency that applies.)

| REQUIREMENT | HOW OFTEN | | | | DOING WHAT |
|---|---|---|---|---|---|
| | Daily | Wkly | Mnthly | Yrly | |
| Filing | X | | | | Misc records, files |
| Sorting | X | | | | Misc. records, files |
| Typing | X | | | | reports, memos, e-mail |
| Writing (by hand) | X | | | | Notes for record, daily records, completing forms. |

Job Description Form - Page 5

| JOB TITLE: CLINICAL EPIDEMIOLOGIST — INFECTION PREVENTION | JOB CODE: 1400 | DATE REVISED: 07/31/2012 |
|---|---|---|

D. **DO THE MAJOR ACTIVITIES OF THE JOB INCLUDE:** (Complete all that apply)

| USE OF | YES | NO | IF YES, DESCRIBE USE |
|---|---|---|---|
| Tools | | X | |
| Telephone | X | | Communicating internally and externally |
| Equipment or machinery (including medical, office and mechanical etc.) | X | | PC, copier, fax, printer, calculator |
| Driving a vehicle | | X | |

E. **ON WHAT TYPES OF SURFACE ARE THE MAJOR ACTIVITIES OF THE JOB PERFORMED?** (Place "X" in all applicable boxes.)

| LEVEL SURFACE | SLIPPERY SURFACE | SLOPING SURFACE | UNSTABLE SURFACE | UNEVEN TERRAIN |
|---|---|---|---|---|
| X | - | - | - | - |
| Other (Specify) | | | | |

F. **DOES THE JOB REQUIRE ANY OF THE FOLLOWING?** (Place "X" in all applicable boxes.)

| FINGER DEXTERITY | CLOSE WORK | GOOD VISION | GOOD COLOR VISION | GOOD HEARING | SPEAKING |
|---|---|---|---|---|---|
| X | - | X | - | X | X |

II. **COMMUNICATIONS REQUIREMENTS**

A. **WHAT TYPES OF COMMUNICATION ARE REQUIRED OF THE JOB?** (Complete all that apply)

| TYPE | HOW LONG (Hrs/day) | DOING WHAT |
|---|---|---|
| Writing | 2 | reports, memos |
| Speaking | 1.50 | speaking to internal & external contacts |
| Hearing | 8 | active listening |

III. **COGNITIVE OR MENTAL REQUIREMENTS**

A. **WHAT TYPES OF COGNITIVE OR MENTAL REQUIREMENTS ARE NEEDED BY THE JOB?** (Complete all that apply)

| REQUIREMENT | HOW LONG (Hrs/day) |
|---|---|
| Reading | 1 |
| Composing letters and/or reports | 2 |
| Simple arithmetic (add/subtract/multiply/divide) | 1 |
| Math reasoning (method formulas) | .50 |
| Analyzing data or report information | 4 |

Job Description Form - Page 6

| JOB TITLE: CLINICAL EPIDEMIOLOGIST – INFECTION PREVENTION | JOB CODE: 1400 | DATE REVISED: 07/31/2012 |
|---|---|---|

## IV. WORKING ENVIRONMENT

### A. WHERE ARE THE MAJOR ACTIVITIES OF THE JOB CARRIED OUT? (Complete all that apply)

| REQUIREMENT | HOW LONG (Hrs/day) |
|---|---|
| Indoors | 8 |
| Outdoors | - |
| At a desk or bench | 7.50 |
| In a car or truck | - |
| In an office or control room | 8 |
| Other (specify) | - |

### B. UNDER WHAT CONDITIONS ARE THE JOB PERFORMED? (Complete all that apply)

| REQUIREMENT | HOW LONG (Hrs/day) |
|---|---|
| Extreme cold | - |
| Extreme heat | - |
| Extreme heights | - |
| Extreme temperature swings | - |
| Constant noise | - |
| Mechanical hazards | - |
| Electrical hazards | - |
| Explosive hazards | - |
| Radiation hazards | - |
| Fume/odor hazards | - |
| Dust/mites hazards | - |
| Chemical hazards | - |
| Blood and/or body fluids | - |
| Sharps hazards | - |
| Toxic waste hazards | - |
| Skin irritants | - |
| Respiratory irritants | - |
| Working in confined spaces | - |
| Infectious Disease exposure | .50 |
| Other (specify): | - |



1433 Amber Court
Burleson, TX 76028

Phone: (682) 231-2317 (cell)
(817) 484-2620 (Home)
E-mail: susan_desessa@hotmail.com

# Susan R. De Sessa, DrPH, CPH

❖ A public health professional with multiple certifications and a strong background in epidemiology, medical terminology, and the basic sciences.
❖ An experienced educator certified to teach science and life science in the state of Texas.

## EDUCATION

University of North Texas Health Science Center
Fort Worth, TX                                                                                          May 2012
- DrPH (Practice)
- GPA – 3.531

National Board of Public Health Examiners
Washington, DC                                                                                    October 2009
- Certified in Public Health (#1047)
- Charter Class

Quality Act Alternative Certification Agency
Irving, TX                                                                                            August 2008
- Certified Teacher: Science 8-12, Life Sciences 8-12

Texas A&M University – Kingsville
Kingsville, TX                                                                              Jan 2005 – Dec 2006
- Teaching Certificate, Life Science 8-12 (Incomplete)
- MS Psychology, 30 hours (Incomplete)

University of North Texas Health Science Center
Fort Worth, TX                                                                                        May 2004
- MPH (Epidemiology)
- Overall 3.5 GPA

Texas A&M University - Kingsville
Kingsville, TX                                                                                        Aug 2002
- BS (Biology)
- Double minor: History & Criminology.
- Cum Laude

## EXPERIENCE

Parkland Health & Hospital System
Dallas, TX                                                                                   Jul 2012 – Current
**Clinical Epidemiologist – Infection Prevention**

Hill College
Hillsboro & Cleburne                                                                       Jan 2011 – Current
**Adjunct Instructor – Biology**
- Freshman Nutrition, Sophomore Anatomy & Physiology
Cleburne, TX
**Adjunct Instructor – Psychology**
- Sophomore level Introduction to Psychology

Tarrant County College District
Fort Worth, TX                                                                             Jan 2009 – Current
**Adjunct Instructor – Life Sciences, South & Southeast Campuses**

- South Campus (06/09 – present)
  - Sophomore level Anatomy & Physiology 1  (Lecture & Lab)
  - Freshman level Biology for Major 1 & 2 (Lecture & Lab)
  - Freshman level General Biology 1 (Lecture)
  - Sophomore level Genetics (Lecture)
- Southeast Campus (01/09 – 07/10)
  - Sophomore level Anatomy & Physiology 1 &2 (Lecture & Lab)
  - Sophomore level Microbiology (Lecture & Lab)

National Park Service                                          June 2011 – December 2011
San Francisco, CA
**Public Risk Management Intern – Golden Gate National Recreation Area**
- Modify Access Database with visitor injury statistics
- Analyze injuries using Stata10 and ArcGIS
- Recommend interventions for visitor injuries

University of North Texas Health Science Center               Fall Semester 2009
Fort Worth, TX
**Graduate Teaching Assistant : Infectious Disease Epidemiology**
- Lecture & Grading for Lead Professor

Bethesda Christian School                                     Aug 2008 – Aug 2009
Haltom City, TX
**Science Teacher**
- 12th grade AP Biology
- 9th grade Pre-AP Biology
- 7th grade Life Sciences
- Responsible for lecture and lab components in all courses

Dallas County Community College District – Northlake College   Oct 2007 – May 2008
Irving, TX
**TRIO Upward Bound Teacher**
- Instruct individual students and focus on individual needs.
- Guide students in applications to schools

Irving High School                                           Aug 2007 – Aug 2008
Irving, TX
**Science Teacher**
- 10th grade Integrated Physics & Chemistry
- 11th & 12th grade Scientific Research & Design
- Direct students in educational needs.
- Construct curriculum based on state guidelines
- Manage up to 35 students at a time, focusing on safety and learning

Corpus Christi-Nueces County Public Health District           Jan 2007 – July 2007
Corpus Christi
**Epidemiologist**
- Conduct disease surveillance for Nueces County
- Review medical records for abnormalities
- Use date from surveillance to give reports to government officials
- Use Microsoft Office products, EpiInfo,  and Stata to present data
- Educate the public about potential health threats
- Input surveillance data into NEDSS Based Systems (NBS)
- Gather information and distribute information for SNS deployment

- Form relationships with hospitals and Doctor's Office's to assist in information sharing
- Monitor/contribute to EPI-X as needed
- Outbreak investigations on unusual and suspicious diseases

Texas A & M – Kingsville                                            May 2006 – Aug 2006
Kingsville, TX
**Student Worker - Teaching Assistant**
- Anatomy and Physiology 1 & 2 Labs

Wal-Mart                                                           Nov 2005 – May 2006
Kingsville, TX
**Sales Associate**
- Stock Shelves
- Exhibit customer service skills
- Responsible monetary practices

Blockbuster                                                       Jun 2004 – Dec 2004
Fort Worth, TX (Jun 04 – Jul 04)
Miami, FL (Jul 04 – Dec 04)
**Customer Service Representative**
- Organize and shelve DVDs and VHS
- Work with the public
- Responsible for proper handling of money

Tarrant County Public Health Department                           Nov 2003 – May 2004
Fort Worth, TX
**Intern in Epidemiology Department**
- Worked on epidemiological surveillance forms and data entry
- Aided in the dissemination of HIV/AIDS brochures
- Contacted patients and physicians to complete surveillance forms
- Educated patients about options related to disorders

Fort Worth Museum of Science and History                          May 2003 – Jul 2004
Fort Worth, TX
**Floor Staff**
- Teach children and adults how to properly use the hands on displays at the museum.
- Ensure the environment is safe for all participants.
- Demonstrate the properties of liquid nitrogen at special events.
- Taught myself to juggle and make balloon animals.

Walt Disney World                                                 Jan 2002 – May 2002
Orlando, FL
**Intern in College Program**
- Performed a variety of jobs and tasks while taking classes through Disney and Disney University.
- Still carried a full load of classes at Texas A&M – Kingsville while in Orlando

Texas A&M University – Kingsville                                  Aug 1999 – Aug 2002
Kingsville, TX
**Student Worker**
**Helping Our Students To Succeed (HOSTS) Tutor (Jun 01 – Aug 01)**
- Introduce students to college life
- Provide peer tutoring & counseling for incoming, at risk freshmen
**Laboratory Assistant (Jan 01 – Dec 01)**

- Taught Anatomy and Physiology Labs
- Taught Cellular and Molecular Biology;
- Taught Zoology

**Accuplacer Test Proctor (Dec 99 – Aug 02)**
- Administer computer-based Accuplacer test for college placement of non-traditional students
- Troubleshoot and fix computer errors, as needed
- Maintain appropriate atmosphere for testing

**Supplemental Instruction (SI) Tutor (Aug 99 – Dec 00)**
- Attend Freshman courses and provide review sessions
- Answer questions about materials covered in class

Fort Dorchester High School                                    Aug 1996 – May 1998
North Charleston, SC
**Student Athletic Trainer**
- Helped the certified athletic trainer treat minor medical problems and helped prevent injuries to athletes by taping joints.
- Attended many specialized conferences on sports injuries and anatomy.

## VOLUNTEER EXPERIENCE

| 2011 | Superbowl XLV Volunteer | Arlington, TX |

2010-current   Fort Worth ISD – Project REACH                           Ft. Worth, TX
- Counseling pregnant teens about health, care of newborns, et cetera
- Assist teens in finding resources
- Educate teens on various issues related to labor & delivery

2008-Current   Tarrant County Health Department                         Ft. Worth, TX
Medical Reserve Corps
- Assist with vaccination clinics
- Assist residents during disasters
- Assist with disease surveillance & subsequent data entry
- Keep training up-to-date in case of emergency

2003 - 2008    Texas A&M University – Kingsville                        Kingsville, TX
- Participated in annual Relay for Life Cancer Walk

2003           University of North Texas Health Science Center          Fort Worth, TX
- Volunteered at the "Comin' Thru Cowtown" marathon

2000-2002      Spohn Kleberg Hospital                                   Kingsville, TX
- Shadowed a physician 10-20 hours per week to gain experience and knowledge in the medical field.

2000-2002      Texas A&M University – Kingsville                        Kingsville, TX
- HOSTS Mentor
- Mentor incoming freshmen to aid in transition to college
- Show students around, give guidance

2001           Spohn Kleberg Hospital                                   Kingsville, TX
- Volunteered a minimum of 5 hours per week at the hospital.
- Helped nurses and physicians when needed.
- Aided in patient care.

2000-2001     Texas A&M University – Kingsville         Kingsville, TX
- Volunteer tutor for the basketball team of Texas A&M – Kingsville.
- Helped several students pass classes through hours of work every week.

## ORGANIZATIONS

- Student Member of APHA
- Vice president of the American Medical Student Association TX A&M–Kingsville.
- Vice president of the Life Science, a Biology Club.
- Senator for the College of Arts & Sciences to the Student Government Assoc.
- Member of Psi Chi – Psychology Honor Society
- Member of Phi Alpha Theta, a history honor society.
- Member of Alpha Lambda Delta, a national honor society.
- Member of Zeta Phi Omega, a social Greek organization.
- Alumni association of Texas A&M-Kingsville
- Alumni association of University of North Texas Health Science Center
- Member of Public Health Student Association (PHSA)
- Member of Medical-Public Health Initiative (MPHI)
- Member of Theta Phi Alpha Greek Sorority
- Member of Forensic Investigation in Research and Education (FIRE)

## CERTIFICATIONS AND CONTINUING EDUCATION

Resiliency Science Institutes International
- Certified in Resilient Leadership - #DJT-041311-123-0003C, Expires 04/14

National Park Service
- Operational Leadership

Federal Communications Commission (FCC):
- Amateur Radio Operator – Technician Level
- EMCOMM I – Emergency Communications for HAM radio operators (17 Sep. 2010)

Federal Emergency Management Agency (FEMA):
- Incident Command System (ICS) 100 – introduction to ICS
- ICS 139 – Exercise Design
- ICS 200 – ICS for single resources & initial action incidents
- ICS 230 – Fundamentals of Emergency Management
- ICS 235 – Emergency Planning
- ICS 240 – Leadership and Influence
- ICS 241 – Decision Making and Problem Solving
- ICS 242 – Effective Communication
- ICS 244 – Developing and Managing Volunteers
- ICS 300 – expanding incidents for operational first responders
- ICS 400 – Advanced ICS – Command and General Staff
- ICS 700 – National Incident Management System (NIMS)
- ICS 800 – National Response Plan (NRP)
- ICS 860 – Introduction to the National Infrastructure Protection Plan (NIPP)
- ICS 1900 – National Disaster Medical System, Federal Coordinating Center Operations
- Emergency Management Institute – Professional Development Series
- IS 001 – Emergency Operations Manager

National Emergency Response and Rescue Training Center (NERRTC):
- Medical Effects of Primary Blast Injuries

Department of Homeland Security & NERRTC:
- WMD/Terrorism Awareness for Emergency Responders
- Emergency Management Concerns for the First Responder in Terrorism and Disasters
- *Bacillus anthracis*
- Botulism
- Children and Nerve Agents
- Bioterrorism: Mass Prophylaxis Preparedness and Planning
- WMD Incident Management/Unified Command Concept
- Introduction to the SNS and Mass Prophylaxis
- Canine Emergency Medical Care
- Basic Public Works Concepts for WMD Incidents
- Avian Flu

TEXAS DEPARTMENT OF STATE HEALTH SERVICES:
- NEDSS Based System (NBS) introductory training
- Intermediate and Advanced NBS training
- CHEMPACK Training

INTERNATIONAL CRITICAL INCIDENT STRESS FOUNDATION:
- Suicide Prevention, Intervention, and Postvention
- Group Crisis Intervention
- Advanced Group Crisis Intervention
- Terrorism: Psychological Impact and Implications
- The Changing Face of Crisis and Disaster Mental Health Intervention
- Grief Following Trauma
- Psychological First Aid with Dr. George S. Everly

N.C. CENTER FOR PUBLIC HEALTH PREPAREDNESS:
- Public Health Implications of Hurricanes
- Preparing for a Hurricane
- ICS for Public Health
- Surveillance Systems: Acute Disease Surveillance & Outbreak Investigation
- Public Health Surveillance Activities in the Wake of Hurricanes
- Hospital Surveillance

JOHNS HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH
- Emerging Infectious Diseases
- Pathogens: Nature and Transmission
- Ecological Principles of Disease Systems: Population Interactions and Dynamics

AMERICAN RED CROSS
- Adult and Child CPR & AED
- First Aid
- Wilderness Medicine Essentials

## EXERCISES & INVESTIGATIONS
- Bio Detection System (BDS) with Post office, FBI, police, fire, and public health, Corpus Christi, TX 2007
- Drive through POD exercises – influenza and back to school vaccines
- Amateur Radio (HAM) Communications Test of POD site for Tarrant County Public Health
- Novel H1N1 pandemic investigation
- Investigations with counterpart epidemiologists in Mexico

- Investigation of upper respiratory illness outbreak at a state institution
- Investigation of gastrointestinal illness on an oil rig in the Gulf of Mexico
- Investigation of outbreak of Norwegian Scabies
- Investigation of Murine Typhus at a School

**CONFERENCES:**

- 2010 - American Industrial Hygiene Association (AIHA) 2010 Professional Conference on Industrial Hygiene (PCIH) – Fort Worth, TX
- 2009 & 2010 -  Annual Health Disparities Conference – UNTHSC Fort Worth, TX
- 2009 - Hansen's Disease Conference,  Dallas, TX
- 2007 – James Steele Diseases in Nature conference, Austin TX
- 2007 – Hurricane preparedness conference, Texas Department of State Health Services, Governors Division of Emergency Management, Galveston, TX

5.19.2012

Appx. 27



# SUBCHAPTER G—STANDARDS AND CERTIFICATION

## PART 482—CONDITIONS OF PARTICIPATION FOR HOSPITALS

### Subpart A—General Provisions

Sec.
482.1  Basis and scope.
482.2  Provision of emergency services by nonparticipating hospitals.

### Subpart B—Administration

482.11  Condition of participation: Compliance with Federal, State and local laws.
482.12  Condition of participation: Governing body.
482.13  Condition of participation: Patient's rights.

### Subpart C—Basic Hospital Functions

482.21  Condition of participation: Quality assessment and performance improvement program.
482.22  Condition of participation: Medical staff.
482.23  Condition of participation: Nursing services.
482.24  Condition of participation: Medical record services.
482.25  Condition of participation: Pharmaceutical services.
482.26  Condition of participation: Radiologic services.
482.27  Condition of participation: Laboratory services.
482.28  Condition of participation: Food and dietetic services.
482.30  Condition of participation: Utilization review.
482.41  Condition of participation: Physical environment.
482.42  Condition of participation: Infection control.
482.43  Condition of participation: Discharge planning.
482.45  Condition of participation: Organ, tissue, and eye procurement.

### Subpart D—Optional Hospital Services

482.51  Condition of participation: Surgical services.
482.52  Condition of participation: Anesthesia services.
482.53  Condition of participation: Nuclear medicine services.
482.54  Condition of participation: Outpatient services.
482.55  Condition of participation: Emergency services.
482.56  Condition of participation: Rehabilitation services.

482.57  Condition of participation: Respiratory care services.

### Subpart E—Requirements for Specialty Hospitals

482.60  Special provisions applying to psychiatric hospitals.
482.61  Condition of participation: Special medical record requirements for psychiatric hospitals.
482.62  Condition of participation: Special staff requirements for psychiatric hospitals.
482.66  Special requirements for hospital providers of long-term care services ("swing-beds").
482.68  Special requirements for transplant centers.
482.70  Definitions.

GENERAL REQUIREMENTS FOR TRANSPLANT CENTERS

482.72  Condition of participation: OPTN Membership.
482.74  Condition of participation: Notification to CMS.
482.76  Condition of participation: Pediatric Transplants.

TRANSPLANT CENTER DATA SUBMISSION, CLINICAL EXPERIENCE, AND OUTCOME REQUIREMENTS

482.80  Condition of participation: Data submission, clinical experience, and outcome requirements for initial approval of transplant centers.
482.82  Condition of participation: Data submission, clinical experience, and outcome requirements for re-approval of transplant centers.

TRANSPLANT CENTER PROCESS REQUIREMENTS

482.90  Condition of participation: Patient and living donor selection.
482.92  Condition of participation: Organ recovery and receipt.
482.94  Condition of participation: Patient and living donor management.
482.96  Condition of participation: Quality assessment and performance improvement (QAPI).
482.98  Condition of participation: Human resources.
482.100  Condition of participation: Organ procurement.
482.102  Condition of participation: Patient and living donor rights.
482.104  Condition of participation: Additional requirements for kidney transplant centers.

5

AUTHORITY: Secs. 1102, 1871 and 1881 of the Social Security Act (42 U.S.C. 1302, 1395hh, and 1395rr), unless otherwise noted.

SOURCE: 51 FR 22042, June 17, 1986, unless otherwise noted.

## Subpart A—General Provisions

### § 482.1 Basis and scope.

(a) *Statutory basis.* (1) Section 1861(e) of the Act provides that—

(i) Hospitals participating in Medicare must meet certain specified requirements; and

(ii) The Secretary may impose additional requirements if they are found necessary in the interest of the health and safety of the individuals who are furnished services in hospitals.

(2) Section 1861(f) of the Act provides that an institution participating in Medicare as a psychiatric hospital must meet certain specified requirements imposed on hospitals under section 1861(e), must be primarily engaged in providing, by or under the supervision of a physician, psychiatric services for the diagnosis and treatment of mentally ill persons, must maintain clinical records and other records that the Secretary finds necessary, and must meet staffing requirements that the Secretary finds necessary to carry out an active program of treatment for individuals who are furnished services in the hospital. A distinct part of an institution can participate as a psychiatric hospital if the institution meets the specified 1861(e) requirements and is primarily engaged in providing psychiatric services, and if the distinct part meets the records and staffing requirements that the Secretary finds necessary.

(3) Sections 1861(k) and 1902(a)(30) of the Act provide that hospitals participating in Medicare and Medicaid must have a utilization review plan that meets specified requirements.

(4) Section 1883 of the Act sets forth the requirements for hospitals that provide long term care under an agreement with the Secretary.

(5) Section 1905(a) of the Act provides that ''medical assistance'' (Medicaid) payments may be applied to various hospital services. Regulations interpreting those provisions specify that hospitals receiving payment under Medicaid must meet the requirements for participation in Medicare (except in the case of medical supervision of nurse-midwife services. See §§ 440.10 and 440.165 of this chapter.).

(b) *Scope.* Except as provided in subpart A of part 488 of this chapter, the provisions of this part serve as the basis of survey activities for the purpose of determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid.

[51 FR 22042, June 17, 1986, as amended at 60 FR 50442, Sept. 29, 1995]

### § 482.2 Provision of emergency services by nonparticipating hospitals.

(a) The services of an institution that does not have an agreement to participate in the Medicare program may, nevertheless, be reimbursed under the program if—

(1) The services are emergency services; and

(2) The institution meets the requirements of section 1861(e) (1) through (5) and (7) of the Act. Rules applicable to emergency services furnished by nonparticipating hospitals are set forth in subpart G of part 424 of this chapter.

(b) Section 440.170(e) of this chapter defines emergency hospital services for purposes of Medicaid reimbursement.

[51 FR 22042, June 17, 1986, as amended at 53 FR 6648, Mar. 2, 1988]

## Subpart B—Administration

### § 482.11 Condition of participation: Compliance with Federal, State and local laws.

(a) The hospital must be in compliance with applicable Federal laws related to the health and safety of patients.

(b) The hospital must be—

(1) Licensed; or

(2) Approved as meeting standards for licensing established by the agency of the State or locality responsible for licensing hospitals.

(c) The hospital must assure that personnel are licensed or meet other applicable standards that are required by State or local laws.

6

**§482.12 Condition of participation: Governing body.**

The hospital must have an effective governing body legally responsible for the conduct of the hospital as an institution. If a hospital does not have an organized governing body, the persons legally responsible for the conduct of the hospital must carry out the functions specified in this part that pertain to the governing body.

(a) *Standard: Medical staff.* The governing body must:

(1) Determine, in accordance with State law, which categories of practitioners are eligible candidates for appointment to the medical staff;

(2) Appoint members of the medical staff after considering the recommendations of the existing members of the medical staff;

(3) Assure that the medical staff has bylaws;

(4) Approve medical staff bylaws and other medical staff rules and regulations;

(5) Ensure that the medical staff is accountable to the governing body for the quality of care provided to patients;

(6) Ensure the criteria for selection are individual character, competence, training, experience, and judgment; and

(7) Ensure that under no circumstances is the accordance of staff membership or professional privileges in the hospital dependent solely upon certification, fellowship, or membership in a specialty body or society.

(8) Ensure that, when telemedicine services are furnished to the hospital's patients through an agreement with a distant-site hospital, the agreement is written and that it specifies that it is the responsibility of the governing body of the distant-site hospital to meet the requirements in paragraphs (a)(1) through (a)(7) of this section with regard to the distant-site hospital's physicians and practitioners providing telemedicine services. The governing body of the hospital whose patients are receiving the telemedicine services may, in accordance with §482.22(a)(3) of this part, grant privileges based on its medical staff recommendations that rely on information provided by the distant-site hospital.

(9) Ensure that when telemedicine services are furnished to the hospital's patients through an agreement with a distant-site telemedicine entity, the written agreement specifies that the distant-site telemedicine entity is a contractor of services to the hospital and as such, in accordance with §482.12(e), furnishes the contracted services in a manner that permits the hospital to comply with all applicable conditions of participation for the contracted services, including, but not limited to, the requirements in paragraphs (a)(1) through (a)(7) of this section with regard to the distant-site telemedicine entity's physicians and practitioners providing telemedicine services. The governing body of the hospital whose patients are receiving the telemedicine services may, in accordance with §482.22(a)(4) of this part, grant privileges to physicians and practitioners employed by the distant-site telemedicine entity based on such hospital's medical staff recommendations; such staff recommendations may rely on information provided by the distant-site telemedicine entity.

(b) *Standard: Chief executive officer.* The governing body must appoint a chief executive officer who is responsible for managing the hospital.

(c) *Standard: Care of patients.* In accordance with hospital policy, the governing body must ensure that the following requirements are met:

(1) Every Medicare patient is under the care of:

(i) A doctor of medicine or osteopathy (This provision is not to be construed to limit the authority of a doctor of medicine or osteopathy to delegate tasks to other qualified health care personnel to the extent recognized under State law or a State's regulatory mechanism.);

(ii) A doctor of dental surgery or dental medicine who is legally authorized to practice dentistry by the State and who is acting within the scope of his or her license;

(iii) A doctor of podiatric medicine, but only with respect to functions which he or she is legally authorized by the State to perform;

(iv) A doctor of optometry who is legally authorized to practice optometry

7

by the State in which he or she practices;

(v) A chiropractor who is licensed by the State or legally authorized to perform the services of a chiropractor, but only with respect to treatment by means of manual manipulation of the spine to correct a subluxation demonstrated by x-ray to exist; and

(vi) A clinical psychologist as defined in § 410.71 of this chapter, but only with respect to clinical psychologist services as defined in § 410.71 of this chapter and only to the extent permitted by State law.

(2) Patients are admitted to the hospital only on the recommendation of a licensed practitioner permitted by the State to admit patients to a hospital. If a Medicare patient is admitted by a practitioner not specified in paragraph (c)(1) of this section, that patient is under the care of a doctor of medicine or osteopathy.

(3) A doctor of medicine or osteopathy is on duty or on call at all times.

(4) A doctor of medicine or osteopathy is responsible for the care of each Medicare patient with respect to any medical or psychiatric problem that—

(i) is present on admission or develops during hospitalization; and

(ii) Is not specifically within the scope of practice of a doctor of dental surgery, dental medicine, podiatric medicine, or optometry; a chiropractor; or clinical psychologist, as that scope is—

(A) Defined by the medical staff;

(B) Permitted by State law; and

(C) Limited, under paragraph (c)(1)(v) of this section, with respect to chiropractors.

(d) *Standard: Institutional plan and budget.* The institution must have an overall institutional plan that meets the following conditions:

(1) The plan must include an annual operating budget that is prepared according to generally accepted accounting principles.

(2) The budget must include all anticipated income and expenses. This provision does not require that the budget identify item by item the components of each anticipated income or expense.

(3) The plan must provide for capital expenditures for at least a 3-year pe-

riod, including the year in which the operating budget specified in paragraph (d)(2) of this section is applicable.

(4) The plan must include and identify in detail the objective of, and the anticipated sources of financing for, each anticipated capital expenditure in excess of $600,000 (or a lesser amount that is established, in accordance with section 1122(g)(1) of the Act, by the State in which the hospital is located) that relates to any of the following:

(i) Acquisition of land;

(ii) Improvement of land, buildings, and equipment; or

(iii) The replacement, modernization, and expansion of buildings and equipment.

(5) The plan must be submitted for review to the planning agency designated in accordance with section 1122(b) of the Act, or if an agency is not designated, to the appropriate health planning agency in the State. (See part 100 of this title.) A capital expenditure is not subject to section 1122 review if 75 percent of the health care facility's patients who are expected to use the service for which the capital expenditure is made are individuals enrolled in a health maintenance organization (HMO) or competitive medical plan (CMP) that meets the requirements of section 1876(b) of the Act, and if the Department determines that the capital expenditure is for services and facilities that are needed by the HMO or CMP in order to operate efficiently and economically and that are not otherwise readily accessible to the HMO or CMP because—

(i) The facilities do not provide common services at the same site;

(ii) The facilities are not available under a contract of reasonable duration;

(iii) Full and equal medical staff privileges in the facilities are not available;

(iv) Arrangements with these facilities are not administratively feasible; or

(v) The purchase of these services is more costly than if the HMO or CMP provided the services directly.

(6) The plan must be reviewed and updated annually.

(7) The plan must be prepared—

8

Appx. 31

Centers for Medicare & Medicaid Services, HHS §482.13

(i) Under the direction of the governing body; and

(ii) By a committee consisting of representatives of the governing body, the administrative staff, and the medical staff of the institution.

(e) *Standard: Contracted services.* The governing body must be responsible for services furnished in the hospital whether or not they are furnished under contract. The governing body must ensure that a contractor of services (including one for shared services and joint ventures) furnishes services that permit the hospital to comply with all applicable conditions of participation and standards for the contracted services.

(1) The governing body must ensure that the services performed under a contract are provided in a safe and effective manner.

(2) The hospital must maintain a list of all contracted services, including the scope and nature of the services provided.

(f) *Standard: Emergency services.* (1) If emergency services are provided at the hospital, the hospital must comply with the requirements of §482.55.

(2) If emergency services are not provided at the hospital, the governing body must assure that the medical staff has written policies and procedures for appraisal of emergencies, initial treatment, and referral when appropriate.

(3) If emergency services are provided at the hospital but are not provided at one or more off-campus departments of the hospital, the governing body of the hospital must assure that the medical staff has written policies and procedures in effect with respect to the off-campus department(s) for appraisal of emergencies and referral when appropriate.

[51 FR 22042, June 17, 1986; 51 FR 27847, Aug. 4, 1986, as amended at 53 FR 6549, Mar. 1, 1988; 53 FR 18987, May 26, 1988; 56 FR 8852, Mar. 1, 1991; 56 FR 23022, May 20, 1991; 59 FR 46514, Sept. 8, 1994; 63 FR 20130, Apr. 23, 1998; 63 FR 33874, June 22, 1998; 68 FR 53262, Sept. 9, 2003; 76 FR 25562, May 5, 2011]

**§482.13  Condition of participation: Patient's rights.**

A hospital must protect and promote each patient's rights.

(a) *Standard: Notice of rights*—(1) A hospital must inform each patient, or when appropriate, the patient's representative (as allowed under State law), of the patient's rights, in advance of furnishing or discontinuing patient care whenever possible.

(2) The hospital must establish a process for prompt resolution of patient grievances and must inform each patient whom to contact to file a grievance. The hospital's governing body must approve and be responsible for the effective operation of the grievance process and must review and resolve grievances, unless it delegates the responsibility in writing to a grievance committee. The grievance process must include a mechanism for timely referral of patient concerns regarding quality of care or premature discharge to the appropriate Utilization and Quality Control Quality Improvement Organization. At a minimum:

(i) The hospital must establish a clearly explained procedure for the submission of a patient's written or verbal grievance to the hospital.

(ii) The grievance process must specify time frames for review of the grievance and the provision of a response.

(iii) In its resolution of the grievance, the hospital must provide the patient with written notice of its decision that contains the name of the hospital contact person, the steps taken on behalf of the patient to investigate the grievance, the results of the grievance process, and the date of completion.

(b) *Standard: Exercise of rights.* (1) The patient has the right to participate in the development and implementation of his or her plan of care.

(2) The patient or his or her representative (as allowed under State law) has the right to make informed decisions regarding his or her care. The patient's rights include being informed of his or her health status, being involved in care planning and treatment, and being able to request or refuse treatment. This right must not be construed as a mechanism to demand the provision of treatment or services deemed medically unnecessary or inappropriate.

(3) The patient has the right to formulate advance directives and to have hospital staff and practitioners who

9

provide care in the hospital comply with these directives, in accordance with §489.100 of this part (Definition), §489.102 of this part (Requirements for providers), and §489.104 of this part (Effective dates).

(4) The patient has the right to have a family member or representative of his or her choice and his or her own physician notified promptly of his or her admission to the hospital.

(c) *Standard: Privacy and safety.* (1) The patient has the right to personal privacy.

(2) The patient has the right to receive care in a safe setting.

(3) The patient has the right to be free from all forms of abuse or harassment.

(d) *Standard: Confidentiality of patient records.* (1) The patient has the right to the confidentiality of his or her clinical records.

(2) The patient has the right to access information contained in his or her clinical records within a reasonable time frame. The hospital must not frustrate the legitimate efforts of individuals to gain access to their own medical records and must actively seek to meet these requests as quickly as its record keeping system permits.

(e) *Standard: Restraint or seclusion.* All patients have the right to be free from physical or mental abuse, and corporal punishment. All patients have the right to be free from restraint or seclusion, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff. Restraint or seclusion may only be imposed to ensure the immediate physical safety of the patient, a staff member, or others and must be discontinued at the earliest possible time.

(1) *Definitions.* (i) A *restraint* is—

(A) Any manual method, physical or mechanical device, material, or equipment that immobilizes or reduces the ability of a patient to move his or her arms, legs, body, or head freely; or

(B) A drug or medication when it is used as a restriction to manage the patient's behavior or restrict the patient's freedom of movement and is not a standard treatment or dosage for the patient's condition.

(C) A restraint does not include devices, such as orthopedically prescribed devices, surgical dressings or bandages, protective helmets, or other methods that involve the physical holding of a patient for the purpose of conducting routine physical examinations or tests, or to protect the patient from falling out of bed, or to permit the patient to participate in activities without the risk of physical harm (this does not include a physical escort).

(ii) *Seclusion* is the involuntary confinement of a patient alone in a room or area from which the patient is physically prevented from leaving. Seclusion may only be used for the management of violent or self-destructive behavior.

(2) Restraint or seclusion may only be used when less restrictive interventions have been determined to be ineffective to protect the patient a staff member or others from harm.

(3) The type or technique of restraint or seclusion used must be the least restrictive intervention that will be effective to protect the patient, a staff member, or others from harm.

(4) The use of restraint or seclusion must be—

(i) In accordance with a written modification to the patient's plan of care; and

(ii) Implemented in accordance with safe and appropriate restraint and seclusion techniques as determined by hospital policy in accordance with State law.

(5) The use of restraint or seclusion must be in accordance with the order of a physician or other licensed independent practitioner who is responsible for the care of the patient as specified under §482.12(c) and authorized to order restraint or seclusion by hospital policy in accordance with State law.

(6) Orders for the use of restraint or seclusion must never be written as a standing order or on an as needed basis (PRN).

(7) The attending physician must be consulted as soon as possible if the attending physician did not order the restraint or seclusion.

(8) Unless superseded by State law that is more restrictive—

(i) Each order for restraint or seclusion used for the management of violent or self-destructive behavior that jeopardizes the immediate physical

10

safety of the patient, a staff member, or others may only be renewed in accordance with the following limits for up to a total of 24 hours:

(A) 4 hours for adults 18 years of age or older;

(B) 2 hours for children and adolescents 9 to 17 years of age; or

(C) 1 hour for children under 9 years of age; and

(ii) After 24 hours, before writing a new order for the use of restraint or seclusion for the management of violent or self-destructive behavior, a physician or other licensed independent practitioner who is responsible for the care of the patient as specified under §482.12(c) of this part and authorized to order restraint or seclusion by hospital policy in accordance with State law must see and assess the patient.

(iii) Each order for restraint used to ensure the physical safety of the non-violent or non-self-destructive patient may be renewed as authorized by hospital policy.

(9) Restraint or seclusion must be discontinued at the earliest possible time, regardless of the length of time identified in the order.

(10) The condition of the patient who is restrained or secluded must be monitored by a physician, other licensed independent practitioner or trained staff that have completed the training criteria specified in paragraph (f) of this section at an interval determined by hospital policy.

(11) Physician and other licensed independent practitioner training requirements must be specified in hospital policy. At a minimum, physicians and other licensed independent practitioners authorized to order restraint or seclusion by hospital policy in accordance with State law must have a working knowledge of hospital policy regarding the use of restraint or seclusion.

(12) When restraint or seclusion is used for the management of violent or self-destructive behavior that jeopardizes the immediate physical safety of the patient, a staff member, or others, the patient must be seen face-to-face within 1 hour after the initiation of the intervention—

(i) By a—

(A) Physician or other licensed independent practitioner; or

(B) Registered nurse or physician assistant who has been trained in accordance with the requirements specified in paragraph (f) of this section.

(ii) To evaluate—

(A) The patient's immediate situation;

(B) The patient's reaction to the intervention;

(C) The patient's medical and behavioral condition; and

(D) The need to continue or terminate the restraint or seclusion.

(13) States are free to have requirements by statute or regulation that are more restrictive than those contained in paragraph (e)(12)(i) of this section.

(14) If the face-to-face evaluation specified in paragraph (e)(12) of this section is conducted by a trained registered nurse or physician assistant, the trained registered nurse or physician assistant must consult the attending physician or other licensed independent practitioner who is responsible for the care of the patient as specified under §482.12(c) as soon as possible after the completion of the 1-hour face-to-face evaluation.

(15) All requirements specified under this paragraph are applicable to the simultaneous use of restraint and seclusion. Simultaneous restraint and seclusion use is only permitted if the patient is continually monitored—

(i) Face-to-face by an assigned, trained staff member; or

(ii) By trained staff using both video and audio equipment. This monitoring must be in close proximity to the patient.

(16) When restraint or seclusion is used, there must be documentation in the patient's medical record of the following:

(i) The 1-hour face-to-face medical and behavioral evaluation if restraint or seclusion is used to manage violent or self-destructive behavior;

(ii) A description of the patient's behavior and the intervention used;

(iii) Alternatives or other less restrictive interventions attempted (as applicable);

(iv) The patient's condition or symptom(s) that warranted the use of the restraint or seclusion; and

11

(v) The patient's response to the intervention(s) used, including the rationale for continued use of the intervention.

(f) *Standard: Restraint or seclusion: Staff training requirements.* The patient has the right to safe implementation of restraint or seclusion by trained staff.

(1) *Training intervals.* Staff must be trained and able to demonstrate competency in the application of restraints, implementation of seclusion, monitoring, assessment, and providing care for a patient in restraint or seclusion—

(i) Before performing any of the actions specified in this paragraph;

(ii) As part of orientation; and

(iii) Subsequently on a periodic basis consistent with hospital policy.

(2) *Training content.* The hospital must require appropriate staff to have education, training, and demonstrated knowledge based on the specific needs of the patient population in at least the following:

(i) Techniques to identify staff and patient behaviors, events, and environmental factors that may trigger circumstances that require the use of a restraint or seclusion.

(ii) The use of nonphysical intervention skills.

(iii) Choosing the least restrictive intervention based on an individualized assessment of the patient's medical, or behavioral status or condition.

(iv) The safe application and use of all types of restraint or seclusion used in the hospital, including training in how to recognize and respond to signs of physical and psychological distress (for example, positional asphyxia);

(v) Clinical identification of specific behavioral changes that indicate that restraint or seclusion is no longer necessary.

(vi) Monitoring the physical and psychological well-being of the patient who is restrained or secluded, including but not limited to, respiratory and circulatory status, skin integrity, vital signs, and any special requirements specified by hospital policy associated with the 1-hour face-to-face evaluation.

(vii) The use of first aid techniques and certification in the use of cardiopulmonary resuscitation, including required periodic recertification.

(3) *Trainer requirements.* Individuals providing staff training must be qualified as evidenced by education, training, and experience in techniques used to address patients' behaviors.

(4) *Training documentation.* The hospital must document in the staff personnel records that the training and demonstration of competency were successfully completed.

(g) *Standard: Death reporting requirements:* Hospitals must report deaths associated with the use of seclusion or restraint.

(1) The hospital must report the following information to CMS:

(i) Each death that occurs while a patient is in restraint or seclusion.

(ii) Each death that occurs within 24 hours after the patient has been removed from restraint or seclusion.

(iii) Each death known to the hospital that occurs within 1 week after restraint or seclusion where it is reasonable to assume that use of restraint or placement in seclusion contributed directly or indirectly to a patient's death. "Reasonable to assume" in this context includes, but is not limited to, deaths related to restrictions of movement for prolonged periods of time, or death related to chest compression, restriction of breathing or asphyxiation.

(2) Each death referenced in this paragraph must be reported to CMS by telephone no later than the close of business the next business day following knowledge of the patient's death.

(3) Staff must document in the patient's medical record the date and time the death was reported to CMS.

(h) *Standard: Patient visitation rights.* A hospital must have written policies and procedures regarding the visitation rights of patients, including those setting forth any clinically necessary or reasonable restriction or limitation that the hospital may need to place on such rights and the reasons for the clinical restriction or limitation. A hospital must meet the following requirements:

(1) Inform each patient (or support person, where appropriate) of his or her visitation rights, including any clinical restriction or limitation on such rights, when he or she is informed of

his or her other rights under this section.

(2) Inform each patient (or support person, where appropriate) of the right, subject to his or her consent, to receive the visitors whom he or she designates, including, but not limited to, a spouse, a domestic partner (including a same-sex domestic partner), another family member, or a friend, and his or her right to withdraw or deny such consent at any time.

(3) Not restrict, limit, or otherwise deny visitation privileges on the basis of race, color, national origin, religion, sex, gender identity, sexual orientation, or disability.

(4) Ensure that all visitors enjoy full and equal visitation privileges consistent with patient preferences.

[71 FR 71426, Dec. 8, 2006, as amended at 75 FR 70844, Nov. 19, 2010]

## Subpart C—Basic Hospital Functions

**§482.21 Condition of participation: Quality assessment and performance improvement program.**

The hospital must develop, implement, and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement program. The hospital's governing body must ensure that the program reflects the complexity of the hospital's organization and services; involves all hospital departments and services (including those services furnished under contract or arrangement); and focuses on indicators related to improved health outcomes and the prevention and reduction of medical errors. The hospital must maintain and demonstrate evidence of its QAPI program for review by CMS.

(a) *Standard: Program scope.* (1) The program must include, but not be limited to, an ongoing program that shows measurable improvement in indicators for which there is evidence that it will improve health outcomes and identify and reduce medical errors.

(2) The hospital must measure, analyze, and track quality indicators, including adverse patient events, and other aspects of performance that assess processes of care, hospital service and operations.

(b) *Standard: Program data.* (1) The program must incorporate quality indicator data including patient care data, and other relevant data, for example, information submitted to, or received from, the hospital's Quality Improvement Organization.

(2) The hospital must use the data collected to—

(i) Monitor the effectiveness and safety of services and quality of care; and

(ii) Identify opportunities for improvement and changes that will lead to improvement.

(3) The frequency and detail of data collection must be specified by the hospital's governing body.

(c) *Standard: Program activities.* (1) The hospital must set priorities for its performance improvement activities that—

(i) Focus on high-risk, high-volume, or problem-prone areas;

(ii) Consider the incidence, prevalence, and severity of problems in those areas; and

(iii) Affect health outcomes, patient safety, and quality of care.

(2) Performance improvement activities must track medical errors and adverse patient events, analyze their causes, and implement preventive actions and mechanisms that include feedback and learning throughout the hospital.

(3) The hospital must take actions aimed at performance improvement and, after implementing those actions, the hospital must measure its success, and track performance to ensure that improvements are sustained.

(d) *Standard: Performance improvement projects.* As part of its quality assessment and performance improvement program, the hospital must conduct performance improvement projects.

(1) The number and scope of distinct improvement projects conducted annually must be proportional to the scope and complexity of the hospital's services and operations.

(2) A hospital may, as one of its projects, develop and implement an information technology system explicitly designed to improve patient safety and quality of care. This project, in its initial stage of development, does not

13

need to demonstrate measurable improvement in indicators related to health outcomes.

(3) The hospital must document what quality improvement projects are being conducted, the reasons for conducting these projects, and the measurable progress achieved on these projects.

(4) A hospital is not required to participate in a QIO cooperative project, but its own projects are required to be of comparable effort.

(e) *Standard: Executive responsibilities.* The hospital's governing body (or organized group or individual who assumes full legal authority and responsibility for operations of the hospital), medical staff, and administrative officials are responsible and accountable for ensuring the following:

(1) That an ongoing program for quality improvement and patient safety, including the reduction of medical errors, is defined, implemented, and maintained.

(2) That the hospital-wide quality assessment and performance improvement efforts address priorities for improved quality of care and patient safety; and that all improvement actions are evaluated.

(3) That clear expectations for safety are established.

(4) That adequate resources are allocated for measuring, assessing, improving, and sustaining the hospital's performance and reducing risk to patients.

(5) That the determination of the number of distinct improvement projects is conducted annually.

[68 FR 3454, Jan. 24, 2003]

§ 482.22  Condition of participation: Medical staff.

The hospital must have an organized medical staff that operates under bylaws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital.

(a) *Standard: Composition of the medical staff.* The medical staff must be composed of doctors of medicine or osteopathy and, in accordance with State law, may also be composed of other practitioners appointed by the governing body.

(1) The medical staff must periodically conduct appraisals of its members.

(2) The medical staff must examine credentials of candidates for medical staff membership and make recommendations to the governing body on the appointment of the candidates.

(3) When telemedicine services are furnished to the hospital's patients through an agreement with a distant-site hospital, the governing body of the hospital whose patients are receiving the telemedicine services may choose, in lieu of the requirements in paragraphs (a)(1) and (a)(2) of this section, to have its medical staff rely upon the credentialing and privileging decisions made by the distant-site hospital when making recommendations on privileges for the individual distant-site physicians and practitioners providing such services, if the hospital's governing body ensures, through its written agreement with the distant-site hospital, that all of the following provisions are met:

(i) The distant-site hospital providing the telemedicine services is a Medicare-participating hospital.

(ii) The individual distant-site physician or practitioner is privileged at the distant-site hospital providing the telemedicine services, which provides a current list of the distant-site physician's or practitioner's privileges at the distant-site hospital.

(iii) The individual distant-site physician or practitioner holds a license issued or recognized by the State in which the hospital whose patients are receiving the telemedicine services is located.

(iv) With respect to a distant-site physician or practitioner, who holds current privileges at the hospital whose patients are receiving the telemedicine services, the hospital has evidence of an internal review of the distant-site physician's or practitioner's performance of these privileges and sends the distant-site hospital such performance information for use in the periodic appraisal of the distant-site physician or practitioner. At a minimum, this information must include all adverse events that result from the telemedicine services provided by the distant-site physician or practitioner

14