IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SUSAN REGENE DE SESSA, ET AL., | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | CIVIL NO. 3:17-CV-1782-BK |
| | § | |
| | § | |
| DALLAS COUNTY HOSPITAL | § | |
| DISTRICT, | § | |
| DEFENDANT. | § | |

## MEMORANDUM OPINION

The parties' have consented to proceed before the undersigned United States Magistrate Judge.  Doc. 39.  Upon review, Defendant's *Objections to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment*, Doc. 61, are **OVERRULED**, and Defendant's *Motion for Summary Judgment*, Doc. 53, is **GRANTED**.

## I.  BACKGROUND

### A.  Procedural History

Plaintiff filed a *qui tam* suit under the False Claims Act (FCA), alleging Defendant made fraudulent claims to the United States for Medicare and Medicaid funds and then retaliated against Plaintiff for being a whistleblower.  Doc. 2 at 24, 28.  After investigating Defendant's insurance claims, the United States filed a motion to dismiss Plaintiff's claim alleging fraud under the FCA.  Doc. 22.  The Court granted the motion and dismissed the claim with prejudice, leaving only Plaintiff's retaliation claim.  Doc. 26.  Since then, Plaintiff has proceeded without the assistance of counsel.  The instant motion for summary judgment followed.

**B. Facts**

Some relationships are doomed from the beginning.

Plaintiff's and Defendant's relationship began in 2012 when Plaintiff began working as an epidemiologist in Parkland Hospital's Infection Prevention ("IP") Department.  Doc. 54 at 10, 14; Doc. 55-61 at 4.  The IP department analyzes and tracks infections in the Hospital, primarily surrounding surgery and recovery from surgery, to identify risks and monitor infection rates.  Doc. 55-7.  Plaintiff's job duties included surveilling infections in patients and hospital personnel and determining where, when, and how infections occurred.  Doc. 55-7 at 3.  She was not assigned to all patients or all infections.  Rather, like other IP staff, she was responsible for tracking only specific, assigned surgeries and units for monitoring and reporting.  Doc. 55-61 at 3.  Moreover, each IP employee is limited to reviewing patient records on Defendant's internal system within their assigned areas so as to comply with HIPPA[1] and hospital policy regarding the security of patient records.  Doc. 55-61 at 3.

During her two-year tenure, there were issues regarding Plaintiff's performance.  Starting almost at the beginning of her employment in July 2012, Plaintiff frequently arrived late and left early, resulting in Defendant taking remedial action, to-wit, requiring Plaintiff to email her supervisor when she arrived and left work.  *See, e.g.*, Doc. 55-16 at 5; Doc. 55-17 at 7; Doc. 55-19 at 1.  Plaintiff's tardiness dovetailed with other issues, including failures to comply with policy and complete her work on time.  Doc. 55-20; *see also* Doc. 55-21 at 3 (noting that Plaintiff violated policy by emailing patient files to her personal email).  She also routinely ran afoul of her fellow employees when, in violation of hospital policy, she reviewed procedures and

---

[1] Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1996).

2

infection reports outside of her assigned areas and would "boss" fellow employees around.  *See* Doc. 55-28 at 1 & Doc. 55-29 at 1.

The complaints were not one-sided.  Plaintiff often complained that Defendant and Defendant's employees incorrectly reported and/or billed for one procedure when a different procedure was performed or when an infection was unreported.  *See, e.g.*, Doc. 55-17 at 2 & Doc. 55-61 at 4.  She submitted her first official complaint in June 2013, stating that she had brought the matter to the attention of her supervisor and other physicians but was rebuffed.  Doc. 55-17 at 2.  Nonetheless, Defendant investigated and was largely unable to substantiate Plaintiff's claims.  Doc. 55-17 at 4.  In a follow-up interview, Plaintiff apparently admitted she had misunderstood some procedure coding practices, and of the numerous procedures Plaintiff had complained about, only two were found to be incorrectly coded.  Doc. 55-17 at 4.

In July 2013, Plaintiff made it clear that she thought she was being retaliated against for her June 2013 complaint.  Doc. 55-17 at 7.  She complained of having to email her supervisor when she arrived and left work, which she saw as a campaign to silence her.  Doc. 55-17 at 7-8.  And, beginning early in her tenure, Plaintiff and Defendant clearly disagreed on the scope of Plaintiff's duties—particularly about whether she should look outside her designated area of responsibility for additional infections and whether finding additional infections vindicated her choice to violate Hospital policy in that regard.  *See* Doc. 55-17 at 14.

To further complicate matters, in July 2013 Plaintiff also alleged that her director targeted her because Plaintiff suffered from a mental health disability.  Doc. 55-32 at 1, Doc. 55-33 at 1.  Defendant investigated and determined there was no targeting, Doc. 55-33 at 1, but did ask Plaintiff to submit an outside medical evaluation.  Doc. 55-34 at 3.  Plaintiff's evaluation indicated she suffered from an impairment that could impact her job performance.  Doc. 55-34 at

1.  In response, Defendant issued Plaintiff a "Scope of Work" document so both parties would be clear on what Plaintiff was and was not supposed to do.  Doc. 55-36 at 1.  Notably, the document made clear that patient data must be stored only on the hospital's shared server and that Plaintiff should not stray outside of her assigned, approved areas and projects.  Doc. 55-36 at 1.

The conflict did not end there, however.  In January 2014, Plaintiff confronted her supervisor in a staff meeting and later alleged that the supervisor retaliated against her in the meeting by pointing out some of her mistakes and ordering her not to talk to the hospital's compliance department about her issues.  Doc. 55-39 at 43; Doc. 55-39 at 5.  Reports from other employees who attended the meeting were inconsistent with Plaintiff's narrative though.  Doc. 55-39 at 46-57.  Two months later, Plaintiff attempted to develop and implement a new policy for cleaning medication boxes—something she had not been assigned to do.  Doc. 55-38 at 2.  And in July of 2014, Plaintiff again accessed patient records outside her assigned area.  Doc. 55-41; Doc. 55-46.

Everything came to a head in August of 2014 when Defendant placed Plaintiff on paid administrative leave for arguing with her chief supervisor at a group committee meeting and lodging unsubstantiated complaints against a fellow employee directly after the argument.  Doc. 55-14 at 22; Doc. 55-61 at 5.  The complaints were found to be meritless and the argument unprofessional.  Doc. 55-14 at 24; Doc. 55-61 at 5.  On October 10, 2014, Defendant issued Plaintiff a "Final Warning" that allowed Plaintiff to return to work under a "Performance Improvement Plan" ("PIP").  Doc. 55-14 at 25-26; Doc. 55-61 at 5.  Under the PIP, Defendant would monitor Plaintiff's performance for 90 days and ensure she completed specific action items.  Doc. 55-14 at 25; Doc. 55-61 at 5.  Among other PIP items, Defendant again specifically prohibited Plaintiff from reviewing patient files not directly assigned to her and, in accordance

with Hospital policy, from moving patient data to unsecure locations.  Doc. 55-14 at 25-26; Doc. 55-61 at 5.

Plaintiff returned to work on October 13, 2014, and almost immediately violated the PIP by accessing patient records for patients not assigned to her.  Doc. 55-54 at 2; Doc. 55-56 at 1; Doc. 55-61 at 6.  Defendant placed Plaintiff on a second paid administrative leave on October 23, 2014.  Doc. 55-14 at 21; Doc. 55-61 at 6.  The next day, Plaintiff filed several new complaints against her fellow employees, alleged that Defendant was retaliating against her, and forwarded hundreds of work files (some of which included patient healthcare information) to her personal email account.  Doc. 55-61 at 6-7.  Subsequently, on November 10, 2014, Defendant fired Plaintiff for poor performance and repeated violations of hospital policies and the PIP. Doc. 55-14 at 35; Doc. 55-61 at 7.  In the termination action report, Plaintiff acknowledged that she looked at a patient record not assigned to her.  Doc. 55-14 at 35.

Throughout Plaintiff's difficult tenure, her complaints often began with what she considered to be an internal reporting failure.  For example, in July 2014, Plaintiff emailed an exhaustive timeline and description of alleged reporting inaccuracies and failures to Defendant. *See* Doc. 55-48.  In this email, Plaintiff linked the failure to report infections to Defendant's filings for payment from the federal government, though she did not directly allege fraud at this time.  Doc. 55-48 at 1 ("I am very concerned that we have multiple months of data that has not been properly reviewed (upon which our 1115 waiver partially is dependent.)").  Plaintiff often characterized her repeated viewings of patient records outside of her assigned area as a way to discover these mistakes, and Defendant's disciplinary actions as impediments to and retaliation for her discoveries.  *See, e.g.*, Doc. 55-44 at 70-71, 73-77.  In an October 24, 2014 email sent to one of Defendant's human resources employees, Plaintiff did characterize Defendant's alleged

infection misreporting as fraud.  Doc. 55-44 at 73, 77.  According to Plaintiff, Defendant's

incorrect reporting of infection rates resulted in fraudulent claims to the United States for

millions of dollars.  Doc. 55-44 at 77.  Notably, this email was sent the same day that Plaintiff,

while on her second administrative leave, submitted another complaint asserting retaliation and

forwarded hundreds of work files to her private email address.  Doc. 55-14 at 21, Doc. 55-61 at

6-7.

## II. APPLICABLE LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  A dispute

regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a

verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A party moving for summary judgment has the initial burden of "informing the district

court of the basis for its motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323

(internal quotation marks omitted).

Once the moving party has properly supported its motion for summary judgment, the

burden shifts to the nonmoving party to "come forward with specific facts showing that there is a

genuine issue for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986) (internal quotations omitted).  "Where the record taken as a whole could not lead to a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Id.*

Conclusory allegations are not competent summary judgment evidence and are thus insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

When ruling on a motion for summary judgment, the Court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Id.* Rule 56 does not, however, impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports her claim. *Id.* When ruling on a summary judgment motion, courts do not consider issues of disputed fact that are "irrelevant and unnecessary." *Anderson*, 477 U.S. at 248.

### III.   ANALYSIS

The "whistleblower" provision of the FCA protects employees who take steps to uncover and report an employer's fraudulent claim submissions to the United States. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). When a party moves for summary judgment in a whistleblower retaliation claim such as this one, the reviewing court applies the *McDonnell Douglas* framework to the evidence. *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 (5th Cir. 2016). Under this framework, the plaintiff must first prove a *prima facie* case of retaliation by showing that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal link existed between the protected activity and the adverse

7

action.  *Id.* at 176 (citations omitted).  Once the employee establishes a *prima facie* case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its action.  *Id.* (citations omitted).  If the employer can state such a reason, "the burden shifts back to the employee to demonstrate that the employer's stated reason is actually a pretext for retaliation." *Id.* (citation omitted).

### A.  Defendant's Objections to Plaintiff's Response

As an initial matter, Defendant objects, Doc. 61, to Plaintiff's entire *Response to the Defendant's Motion for Summary Judgment*, Doc. 60.  It offers numerous grounds on which the Court could strike some or all of Plaintiff's response as, *inter alia*, non-compliant with local rules, irrelevant, conclusory, and unauthenticated.  *See, e.g.*, Doc. 61 at 1, 3, 5.  Plaintiff did not respond to the motion.

Nevertheless, upon consideration, Defendant's objections are **OVERRULED**.  The Court has neither considered nor relied on any incompetent summary judgment evidence.  Regarding the screen-shots Plaintiff included within her response, the Court recognizes some from Defendant's own appendix and others which are public records.  Thus, any prejudice to Defendant in that regard is negligible.  Further, though Plaintiff presented these documents in an unconventional manner, the Court independently determined the relevance and weight, if any, to accord them.

### B.  Plaintiff's *Prima Facie* Case

Defendant does not argue that Plaintiff cannot establish a *prima facie* case of retaliation, instead only arguing that the potential time frame for both the protected activity and the adverse action should be limited.  *See* Doc. 54 at 38-40.  Specifically, Defendant admits that Plaintiff's October 24, 2014 email, in which she stated that "the end of year numbers [Defendant] release[s]

to the government and claim[s] millions of dollars based on our lower infection rates are all fraudulent," could constitute the initiation of protected activity because it directly references fraudulent claims submitted to the government. Doc. 54 at 38; Doc. 55-44 at 77. The Court agrees. *See Robertson*, 32 F.3d at 952 (holding that employee's complaints must allege illegal, unlawful, or false claims to constitute protected activity). Similarly, Defendant does not argue Plaintiff did not suffer an adverse employment action or that there is not a temporal proximity between her protected activity and her termination. *See* Doc. 54 at 41.

At this stage of the analysis, Plaintiff only needs to establish a causal connection between the protected activity (the October 24, 2014 email) and the adverse employment action, her termination, to shift the burden to Defendant. *Garcia v. Prof'l Contract Serv., Inc.*, 938 F.3d 236, 242 (5th Cir. 2019). This causal connection requirement can be met in several ways, the simplest being a temporal proximity between the activity and the action. *Id.* While there is no demarcation of the temporal boundaries necessary to show a causal connection, the law of this circuit reflects that the period is measured in months, not days. *See, e.g.*, *id*. at 243 (collecting cases and suggesting that a gap of as much as four months between protected activity and adverse employment action was close enough). Here, Plaintiff sent her email, the protected activity, on October 24, 2014. Doc. 55-44 at 73. Defendant fired her 17 days later on November 10, 2014. Doc. 55-14 at 35. Thus, Plaintiff has made a *prima facie* case, and the pendulum now swings towards Defendant.

### C. Defendant's Legitimate, Non-Retaliatory Reason

Defendant has the burden to articulate a legitimate, non-retaliatory reason for the adverse action. *Diaz*, 820 F.3d at 176. To do so, Defendant points to Plaintiff's extensive and continuing "series of well-documented performance failures and breaches of hospital policy." Doc. 54 at

9

41.  The evidence submitted by Defendant paints a compelling picture of an employee who extensively and consistently violated Hospital policies.  Although the impetus of this suit was Defendant's alleged failure to accurately report infection rates, the evidence establishes that Defendant had ongoing personnel issues relating to her attendance, tardiness, performance, failure to follow directions, conflicts with fellow employees and her supervisors, and policy breaches that began well before she alleged fraud.  *See supra*.  And any one of these issues could serve as a legitimate reason for Defendant to terminate Plaintiff.  However Defendant need only prove one—Plaintiff consistently violated Defendant's policy and repeated warnings as well as her PIP forbidding her from accessing patient files that were not assigned to her.  *See, e.g.*, Doc. 55-61 at 6, Doc. 55-54 at 2, Doc. 55-56 at 1.  Plaintiff even admitted that she violated this policy more than once, including during her suspension.  *See, e.g.*, Doc. 55-14 at 35.  Thus, Defendant has established a legitimate, non-retaliatory reason for firing Plaintiff.  Doc. 55-14 at 35; *see United States ex rel. King v. Solvay Pharm, Inc.*, 871 F.3d 318, 332 n. 13 (5th Cir. 2017) (noting that terminating an employee for violating company policy is a legitimate, non-retaliatory reason).  The pendulum swings back.

### D.  Pretext

Plaintiff thus is required to point to evidence showing that Defendant's stated reason for terminating her is simply a pretext for retaliation.  *See Diaz*, 820 F.3d at 176.  The FCA prohibits an employer from taking adverse employment action against an employee "because of" the employee's protected activity relating to an FCA suit.  31 U.S.C. § 3730(h)(1).  To show pretext, a plaintiff must therefore point to evidence creating a genuine issue of material fact that her protected acts were the but-for cause of her termination.  *Solvay Pharm. Inc.*, 871 F.3d at 334 (citation omitted).  In this, Plaintiff fails.

When reviewing this motion for summary judgment, the Court has considered all evidence in the light most favorable to Plaintiff and resolved all factual disputes in her favor. *See Forsyth*, 19 F.3d at 1533. But a plaintiff must first actually make the argument and point to or produce some evidence to support it before the court can lean her way. *See Ragas*, 136 F.3d at 458. However, here, Plaintiff fails to do so. On careful review of Plaintiff's response, there is no mention of pretext or any argument, rationale, or supporting evidence that may be construed as addressing pretext. *See* Doc. 60.

This situation is analogous to that addressed by the court in *Diaz*. There, the plaintiff did not mention the issue of pretext in his response, nor did he present sufficient evidence to create a fact issue. *Diaz v. Kaplan Higher Educ., L.L.C.*, SA-14-CA-581, 2015 WL 12570895 *4 (W.D. Tex. Mar. 6, 2015). The district court entered summary judgment for the defendant, citing plaintiff's failure to carry his burden on pretext. *Id.* On appeal, the plaintiff argued that even though he did not say the word pretext, his statement of facts and his discussion of the elements of retaliation were "credible evidence and argument" of pretext and were therefore enough to survive summary judgment. *Diaz*, 820 F.3d at 176. The Court of Appeals for the Fifth Circuit found this argument unpersuasive, noting that "the party opposing summary judgment is required to identify specific evidence in the record *and to articulate the precise manner in which that evidence supports his or her claim*." *Id.* (emphasis in original) (*citing Ragas*, 136 F.3d at 458). Applying that rationale, the court found that the plaintiff's failure to discuss pretext "*at all*" in his response resulted in a failure to articulate the manner in which the evidence supported his claim, and affirmed the district court. *Id.* (emphasis in original).

A comparison between *Diaz* and the instant case is illuminating. Again, Plaintiff did not argue pretext in any way in her response. She did not list it as an element, argue that it existed,

11

or point to any evidence that would even attempt to establish it.  Even under the deference due a *pro se* litigant, this is not enough to survive summary judgment.  *See E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014) (*pro se* litigants are held to the same standard and must present the same evidence to survive summary judgment as represented parties).  Thus, Plaintiff's failure to argue pretext is fatal to her claim.

### IV.   CONCLUSION

Defendant's *Objections to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment*, Doc. 61, are **OVERRULED**, and Defendant's *Motion for Summary Judgment*, Doc. 53, is **GRANTED**.  Plaintiff's case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED** on March 31, 2021.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

12